IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE[1]
January 28, 2025 Session

## STATE OF TENNESSEE v. MICHAEL FLAMINI, JR.

**Appeal from the Criminal Court for Knox County**
**No. 120471          Steven W. Sword, Judge**

_____

### No. E2023-01292-CCA-R3-CD

_____

The Defendant, Michael Flamini, Jr., was convicted by a Knox County Criminal Court jury of possession with the intent to manufacture, deliver, or sell one-half gram or more of methamphetamine, a Class B felony; and possession with the intent to manufacture, deliver, or sell less than fifteen grams of fentanyl, a Class C felony. *See* T.C.A. §§ 39-17-434 (2018) (possession with intent to manufacture, deliver, or sell methamphetamine); 39-17-417 (Supp. 2020) (subsequently amended) (possession with the intent to manufacture, deliver, or sell fentanyl). The trial court sentenced the Defendant as a Range II offender and imposed concurrent sentences of fifteen years and ten years, respectively. On appeal, the Defendant contends that the trial court (1) erred by denying his motion to suppress, (2) erred by denying his motion for a mistrial, and (3) violated his right to remain silent by admitting evidence related to a civil asset forfeiture proceeding. We conclude that the trial court erred by admitting evidence of an asset forfeiture order. However, we, likewise, conclude that the error was harmless and affirm the judgments of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which TOM GREENHOLTZ and KYLE A. HIXSON, JJ., concurred, in part, and filed separate opinions.

Eric Lutton, District Public Defender; Jonathan Harwell and Halle Hammond (on appeal), Assistant District Public Defenders; and Michael Tabler and Jacob Feuer (at trial), Assistant District Public Defenders, for the Appellant, Michael Flamini, Jr.

---

[1] Oral argument was held at the University of Tennessee College of Law.

Jonathan Skrmetti, Attorney General and Reporter; Garrett D. Ward, Senior Assistant Attorney General; Charme P. Allen, District Attorney General; Ta Kisha Fitzgerald and Sean Bright, Assistant District Attorneys General, for the Appellee, State of Tennessee.

## OPINION

The Defendant's convictions relate to a May 14, 2021 police encounter. A Knoxville Police Department (KPD) officer stopped the Defendant's car on the basis that a windshield crack obstructed the Defendant's view of the roadway and that the car's temporary license plate had expired. During the traffic stop, the Defendant did not possess a driver's license or any form of identification. A subsequent search of the Defendant and his car resulted in the discovery of what was later determined to be 3.1 grams of methamphetamine and 2.14 grams of fentanyl. The Defendant was initially charged with the possession with the intent to manufacture, deliver, or sell heroin based upon the officer's inaccurate belief that the substances were heroin. The Defendant was not charged with driving without possessing a driver's license, the equipment violation, or having an expired temporary license plate. The indictment charged the Defendant with possession with the intent to manufacture, deliver, or sell one-half gram or more of methamphetamine and possession with the intent to manufacture, deliver, or sell less than fifteen grams of fentanyl. At the trial, the Defendant did not dispute that he possessed methamphetamine and fentanyl. However, he argued that he possessed the controlled substances for personal use. The jury rejected this claim and convicted the Defendant as charged in the indictment. This appeal followed.

## I.      Motion to Suppress

Before the trial, the Defendant filed a motion to suppress the evidence seized during the warrantless searches on the grounds that the traffic stop lacked "sufficient cause." Alternatively, the Defendant argued that even if the officer possessed sufficient cause to initiate the traffic stop, the length of the detention extended beyond what is constitutionally reasonable and that he was subjected to a custodial interrogation without having been advised of his *Miranda* rights.

A trial court's findings of fact on a motion to suppress are conclusive on appeal unless the evidence preponderates against them. *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996); *State v. Jones*, 802 S.W.2d 221, 223 (Tenn. Crim. App. 1990). Questions about the "credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *Odom*, 928 S.W.2d at 23. The prevailing party is entitled to the "strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence." *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998); *see State v. Hicks*, 55 S.W.3d 515, 521 (Tenn. 2001). The trial court's application of the law to its

factual findings is a question of law and is reviewed de novo on appeal. *State v. Yeargan*, 958 S.W.2d 626, 629 (Tenn. 1997). In reviewing a trial court's ruling on a motion to suppress, this court may consider the trial evidence as well as the evidence presented at the suppression hearing. *See State v. Henning*, 975 S.W.2d 290, 297-99 (Tenn. 1998); s*ee also State v. Williamson*, 368 S.W.3d 468, 473 (Tenn. 2012).

The trial court held a September 23, 2022 hearing on the Defendant's motion to suppress. KPD Officer Neil Marasigan testified that on May 14, 2021, he patrolled the East Knoxville area and saw a sedan with a cracked windshield, which he said obstructed the driver's view. He said that he positioned his cruiser behind the car and that he saw the temporary license plate had expired. Officer Marasigan said that as a result of the cracked windshield and the expired temporary license plate, he initiated a stop of the Defendant's car.

Officer Marasigan testified that he asked for the Defendant's driver's license, proof of insurance, and registration but that the Defendant did not possess the documents. Officer Marasigan said that after the Defendant could not provide a driver's license or identification, Officer Marasigan asked if the Defendant was on probation or parole. Officer Marasigan said that although the Defendant denied being on any type of supervision, he stated that he had been released recently from prison for a robbery conviction. Officer Marasigan said that at this juncture, he asked the Defendant to step outside the car and placed him in handcuffs. Officer Marasigan said that he detained the Defendant because he did not have a driver's license, had been released recently from prison for robbery, and for officer safety. Officer Marasigan said that as the Defendant stepped out of the car, and as he placed handcuffs on the Defendant, he saw on the driver's seat a "clear vial with [a] gray and white powdery substance," which he said resembled heroin based upon his previous experience as a police officer.

Officer Marasigan testified that after the Defendant was placed in handcuffs, he performed a "safety pat-down search," during which time he felt three packages or "baggies" around the Defendant's buttocks area. Officer Marasigan said he later retrieved the packages because, based upon his previous experience as a police officer, "narcotic sale suspects were known to carry packages in their underwear."

A portion of the police cruiser video recording, which lacked sound and which showed the initial traffic stop, was received as an exhibit. In the recording, the police cruiser moved behind the Defendant's car on the roadway. Twenty-seven seconds into the recording, the right turn light on the Defendant's car was activated, and three seconds later, the officer initiated a traffic stop. The Defendant parked his car at a convenience store forty-eight seconds into the recording. Officer Marasigan approached the car and spoke to the Defendant, who left the car and was placed in handcuffs two minutes and nine seconds into the recording.

Officer Marasigan testified that he saw the cracked windshield before the cruiser camera was activated. He identified a photograph of the windshield, which showed horizontal cracks across the windshield. He, likewise, identified a photograph of the temporary license plate that showed an expiration date of May 7, 2021, which was one week before the traffic stop. The photographs were received as exhibits.

A portion of the recording from Officer Marasigan's body camera was played for the trial court. In the recording, Officer Marasigan approached the car, asked the Defendant to lower all of the car's windows, identified himself as a KPD officer, and informed the Defendant of the expired temporary license plate and the cracked windshield as the reasons for the traffic stop. The Defendant said that he thought the temporary license plate expired at the end of the month, but he did not dispute the officer's stating the expiration date was May 7. Officer Marasigan asked for the Defendant's driver's license, proof of insurance, and registration. The Defendant stated that he did not have a driver's license, any type of identification, proof of insurance, and registration but that the car was not stolen. The Defendant said the car belonged to his wife.[2] Officer Marasigan asked if the Defendant was on probation or parole, and the Defendant said, "No, sir. I just got out of prison. I go to work." When Officer Marasigan asked why he spent time in prison, the Defendant said for a robbery conviction. Officer Marasigan did not ask for the Defendant's name or any other identifying information.

In the recording, Officer Marasigan told the Defendant to turn off the car's engine, and the Defendant complied. The Defendant said that he did not have a weapon and that Officer Marasigan "could search it." Officer Marasigan asked the Defendant to step outside the car, and the Defendant complied. As the Defendant stepped out of the car, Officer Marasigan grabbed the Defendant's arm, told the Defendant to turn around and to place his hands behind his back, and the Defendant complied. Officer Marasigan told the Defendant that he was not under arrest and that he was only being detained, as the officer handcuffed the Defendant.

In the recording, Officer Marasigan asked the Defendant who owned the car, and the Defendant responded it was his wife's car. Officer Marasigan asked where the Defendant lived, and the Defendant responded accordingly. Officer Marasigan patted down the Defendant while asking if the Defendant possessed any weapons. The Defendant said a knife was inside the car. The pat-down frisk, which began two minutes and twenty-six seconds into the recording, lasted approximately twenty seconds. When Officer Marasigan performed the pat-down on the Defendant's pants pockets, Officer

---

[2] The owner of the car is referred to as the Defendant's "girl," "girlfriend," and his "wife." We use wife for consistency.

Marasigan manipulated the area with his hands. He asked the Defendant if he had any money, and the Defendant responded, "Yeah."

After patting down the Defendant, Officer Marasigan walked the Defendant toward the police cruiser. Officer Marasigan used his police radio to inform dispatch that he had a person "in custody." Referring to this portion of the recording, Officer Marasigan stated that he placed the Defendant in custody because he saw on the driver's seat the vial containing a gray and white powdery substance. In the recording, as Officer Marasigan and the Defendant walked toward the police cruiser, the Defendant stated that he had "dope" in the car. Officer Marasigan stated that he already saw the drugs. Officer Marasigan placed the Defendant against the police cruiser and asked the Defendant what was "under [the Defendant's] butt," and the Defendant initially shook his head from side to side in the negative without speaking. As Officer Marasigan touched the Defendant's buttocks area, Officer Marasigan told the Defendant to be honest because Officer Marasigan already felt something inside the Defendant's pants. The Defendant stated that he possessed "more dope," which he said was below his underwear. The contents of the Defendant's pants pockets were emptied onto the police cruiser.[3] Cash was removed, and Officer Marasigan stated, "That's a lot of cash, dude." Officer Marasigan retrieved a white folded paper from the Defendant's pants pocket, which contained a substance that Officer Marasigan believed to be heroin. Afterward, Officer Marasigan told the assisting officer, who arrived at the scene during the incident, that Officer Marasigan had not obtained the Defendant's "information yet" and that the Defendant did not have any identification. Officer Marasigan searched the car and recovered the vial containing what he believed to be drugs from the driver's seat, two "crack pipes," and two sets of weighing scales. After the search of the car, the Defendant was removed from the police cruiser, and Officer Marasigan retrieved a plastic bag from the Defendant's underwear.

The trial court interjected and stated that the recording showed the Defendant was under arrest and that the initial stop had ended. The court asked to view the portion of the recording at which time the officer began questioning the Defendant again in order to address the *Miranda* issue. The State conceded that any statement the Defendant made after being placed in custody but before being advised of his *Miranda* rights was inadmissible. The State conceded, as well, that the Defendant was in police custody when Officer Marasigan used his radio to inform dispatch that the Defendant was in custody while walking the Defendant toward the police cruiser. The recording resumed and reflects that Officer Marasigan advised the Defendant of his *Miranda* rights, and the Defendant said he understood his rights. Officer Marasigan released the car to the Defendant's wife, who came to the scene.

---

[3] The recording reflects that by this time, an additional police officer was at the scene.

On cross-examination, Officer Marasigan testified that as the Defendant's car moved past the location at which Officer Marasigan's police cruiser was parked, he saw the windshield crack, which he said violated a law related to obstructing the driver's view. Officer Marasigan said that the Defendant did not commit any moving violations and that he saw the expired temporary license plate when he followed behind the Defendant's car. Officer Marasigan denied that he activated his cruiser's blue lights before he saw the expired temporary license plate. He said that he activated his blue lights thirty seconds into the recording and that activating the blue lights turned on the recording.

Officer Marasigan testified that a cracked windshield and an expired temporary license plate were not arrestable offenses but, rather, cite-and-release offenses. He agreed that although the Defendant did not possess any identification, he did not know whether the Defendant had been issued a valid driver's license. Officer Marasigan agreed that driving without possessing a valid driver's license was also a cite-and-release offense. He agreed that his asking the Defendant if he were on probation or parole and what offense led to the Defendant's incarceration were irrelevant to the windshield and temporary license plate violations and to verifying the Defendant's identity.

Officer Marasigan testified that he told the Defendant to step out of the car because he "had to verify who he was." Officer Marasigan said that he detained the Defendant for officer safety because the Defendant reported having been released recently from prison for a robbery conviction. Officer Marasigan agreed that he did not ask the Defendant for his name, Social Security number, driver's license number, or address before he asked whether the Defendant was on probation or parole and the offense leading to the Defendant's incarceration. Officer Marasigan agreed that this information could have assisted in determining the Defendant's identity.

Officer Marasigan testified that after the Defendant stepped out of the car, he patted down the Defendant for weapons. Officer Marasigan said that he felt a "bulge" in the Defendant's pocket, that he "manipulate[d]" the bulge with his hand, and that he thought the bulge was money. Officer Marasigan said that he patted down the Defendant's buttocks area, that he felt a lump, and that he manipulated and touched the lump, and that he "figure[d] out" what caused the lump. Officer Marasigan said that at this point, he walked the Defendant toward the police cruiser.

Officer Marasigan testified that although he believed the substance inside the vial visible on the driver's seat was a controlled substance, he did not know its identity. He said that he placed the Defendant under arrest based upon the substance inside the vial. Officer Marasigan said that the Defendant's statement about dope being inside the car occurred before the arrest. Officer Marasigan said that the Defendant did not consent to

being searched. Officer Marasigan agreed that the car was not stolen and that the Defendant's wife was allowed to drive the car from the scene.

Officer Marasigan testified that he determined he had probable cause to search the car because he saw a controlled substance inside. He denied that an inventory search was the basis for the search of the car. On redirect examination, Officer Marasigan stated that the Defendant consented to a search of the car.

After the proof, the trial court determined that the initial stop was valid. The court credited Officer Marasigan's testimony, which the court found was verified by the video recordings. The court concluded that the traffic stop was valid based upon Officer Marasigan's belief that the windshield crack obstructed the driver's view and upon the temporary license plate violation.

The trial court considered whether the traffic stop became unreasonable because Officer Marasigan exceeded the basis of the stop in scope, manner, or duration. The court found that the Defendant's failure to produce a driver's license or any identification "completely changes the nature of this stop." The court noted that pursuant to *Pennsylvania v. Mimms*, 434 U.S. 106 (1977), an officer is permitted to ask a driver to step out of the car during a traffic stop without any additional justification within the context of officer safety. The court found that Officer Marasigan asked the Defendant to step out of the car to ensure the officer's safety and that Officer Marasigan could have requested the Defendant step out of the car as a matter of course to discuss the expired temporary license plate. The court determined that the request for the Defendant to step out of the car was not unreasonable. The court determined that Officer Marasigan was, likewise, permitted to request that the Defendant step out of the car pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968), because the Defendant did not have identification and because the Defendant stated he had been incarcerated for robbery.

The trial court determined that it was not unreasonable for Officer Marasigan to ask the Defendant if he was serving a sentence on probation or parole in order to determine if the Defendant was subject to a search at any time as a condition of release. The court noted that the Defendant's response that he had been released recently from prison for robbery probably was inadmissible but that the response provided Officer Marasigan with justification to request that the Defendant step out of the car and to conduct a pat-down frisk. The court found that as soon as Defendant stepped out of the car, Officer Marasigan observed the vial containing what Officer Marasigan believed to be heroin, a controlled substance. The court found that the Defendant was in police custody and under arrest for possession of the vial when Officer Marasigan placed the Defendant in handcuffs and frisked him. The court found, as well, that Officer Marasigan's manipulating the Defendant's pants during the frisk was irrelevant because the search of the Defendant was incident to a lawful arrest. The court, likewise,

determined that the search of the Defendant's car was incident to the arrest, even if the Defendant had not consented to a search of the car.

Regarding *Miranda*, the prosecutor clarified for the trial court that she only sought admission of one statement made by the Defendant before he was given his *Miranda* rights. The prosecutor stated that although the Defendant was in police custody when Officer Marasigan used his radio to inform dispatch that the Defendant was in custody, the Defendant stated without interrogation that "there's dope in the car." The prosecutor conceded that any other statement before the Defendant was read his *Miranda* rights was inadmissible. The court stated that it would have to review the recording to determine when the Defendant was advised of his *Miranda* rights and whether the Defendant's statement was the product of interrogation.

After the suppression hearing, the trial court entered a written order denying the motion to suppress. The court credited Officer Marasigan's testimony and found that the officer's testimony was mostly supported by the video recordings. The court found that the officer saw the Defendant's car had a cracked windshield, that the officer followed behind the Defendant's car, and that the officer saw the temporary license plate had expired. The court found that the officer approached the Defendant's car and immediately told the Defendant that he stopped the Defendant because of the cracked windshield and the expired temporary license plate. The court found that the officer immediately asked for the Defendant's driver's license or identification, that the Defendant said he did not have either, and that the officer asked the Defendant if he was on probation or parole. The court found that the Defendant responded that he was not under any supervision but that he had been released recently from prison for a robbery conviction. The court found that the officer asked the Defendant to step out of the car and that he saw in plain view what appeared to be a controlled substance inside a vial on the driver's seat. The court found that the officer told the Defendant that the Defendant was being detained but was not under arrest and that the officer placed the Defendant in handcuffs because of concern for officer safety based upon the Defendant's statement that he had been released recently from prison for a robbery conviction. The court found that the officer walked the handcuffed Defendant to the police cruiser and that the officer used his radio to inform dispatch that the Defendant was in custody. The court found that afterward, the officer searched the Defendant and the Defendant's car.

The trial court found that the police cruiser recording showed that the traffic stop was not initiated until the officer drove behind the Defendant's car and could view the expired temporary license plate. The court concluded that the officer had reasonable suspicion to conduct a brief investigatory detention for the purpose of determining if the Defendant's view was obscured by the windshield crack. The court, likewise, determined that the officer had probable cause to believe the temporary license plate was expired.

The court determined that the initial warrantless stop of the Defendant was valid pursuant to *State v. Vineyard*, 958 S.W.2d 730, 734 (Tenn. 1997).

In considering whether the length and scope of the detention exceeded the basis for the initial detention and subsequent discovery of contraband, the trial court found that the officer was justified in asking the Defendant for a driver's license or identification because the Defendant drove a car on a public roadway and because the officer needed to determine the Defendant's identity in order to issue a citation. The court found that when the Defendant stated he did not have a driver's license or identification, the officer had probable cause to believe "a different violation had occurred," which "created an entirely new line of investigation." The court found that the officer "had no way to determine" the Defendant's identity. The court disagreed with the defense's position that the officer could have asked for the Defendant's name and confirmed his identity through the police databases and online searches. The court noted that the issue was whether the officer's actions were unreasonable, not whether the officer could have done something different.

The trial court determined that the Defendant's lack of a driver's license and identification, along with his recent release from prison for robbery, "justified the officer's request" for the Defendant to step out of the car. *See Mimms*, 434 U.S. at 106; *see also State v. Hanning*, 296 S.W.3d 44 (Tenn. 2009). The court found that as the Defendant stepped out of the car, the officer saw in plain view what the officer believed to be a controlled substance, which gave the officer probable cause to arrest the Defendant for possession of a controlled substance. The court determined that any delay in the detention was the result of the Defendant's failure to possess a driver's license while driving the car. The court noted that probable cause for the arrest existed "about two minutes into the stop" and determined that unreasonable delay did not occur. In its oral findings at the motion hearing, the trial court determined that, based upon the officer's seeing the vial containing suspected heroin, the officer was justified in searching the Defendant and the car "incident to the arrest."

In considering whether the Defendant was subjected to custodial interrogation before being advised of his *Miranda* rights, the trial court determined that the Defendant was in police custody when the officer placed the Defendant in handcuffs and walked him toward the police cruiser. The court determined that any responses from the Defendant to the officer's questions before the Defendant was advised of his *Miranda* rights were inadmissible, with the exception of the Defendant's "spontaneous statement" that drugs were inside the car. The court found that as the officer walked the Defendant toward the police cruiser, the Defendant stated, without any questioning or prompting from the officer, that drugs were inside the car and that the officer stated the officer had seen the drugs. The court determined that the Defendant's statement was not the product of interrogation designed to elicit an incriminating response and that, as a result, the statement was admissible.

On appeal, the Defendant contends that the trial court erred by denying his motion to suppress. The Defendant appears to have abandoned his argument that the officer lacked reasonable suspicion or probable cause to initiate the traffic stop. In his brief, he states that the expired temporary license plate "arguably entitled" the officer to initiate the traffic stop. Further, the Defendant concedes that after he told the officer that he did not have a driver's license, the officer had reasonable suspicion to believe that the Defendant was driving a car without a driver's license and "was perhaps entitled to properly investigate those offenses" and to issue the appropriate citations, if probable cause existed.

However, the Defendant argues that the officer's request for him to step outside the car was not pursuant to *Mimms*. *See State v. Donaldson*, 380 S.W.3d 86, 93 (Tenn. 2012). Rather, he argues that he was not asked to step outside of his car in order for his traffic offenses to be investigated and that the officer did not have particularized suspicion to justify the pat-down frisk pursuant to *Terry*. *See State v. Bridges*, 963 S.W.2d 487 (Tenn. 1997). He argues that his previously completed prison sentence for robbery did not provide reasonable suspicion to conclude that he possessed any weapons and that, as a result, the officer's ordering him out of the car and patting him down for weapons was unreasonable.

The State responds that the warrantless searches of the Defendant and his car were proper because they were conducted incident to a lawful arrest. For the first time on appeal, the State argues that the officer properly arrested the Defendant after learning that he lacked a driver's license. *See State v. Jackson*, 313 S.W.3d 270, 273 (Tenn. Crim. App. 2008) (driving without a license is an offense for which a person *may* be arrested). The State asserts that the officer's subjective intent merely to detain the Defendant was irrelevant and that the officer "clearly arrested" the Defendant by placing handcuffs on him as he stepped out of the car.

The Fourth Amendment to the United States Constitution and article I, section 7 of the Tennessee Constitution protect individuals from unreasonable searches and seizures. *See* U.S. Const. amend. IV; Tenn. Const. art. 1, § 7. Warrantless seizures are "presumed unreasonable, and evidence discovered as a result thereof is subject to suppression unless the State demonstrates that the . . . seizure was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement." *State v. Yeargan*, 958 S.W.2d 626, 629 (Tenn. 1997); *see Coolidge v. New Hampshire*, 403 U.S. 443, 454-55 (1971); *State v. Binette*, 33 S.W.3d 215, 218 (Tenn. 2000).

A law enforcement officer's initiating a traffic stop constitutes a seizure pursuant to the United States and Tennessee Constitutions. *Whren v. United States*, 517 U.S. 806, 809-10 (1996); *see Delaware v. Prouse*, 440 U.S. 648, 653 (1979); *see also Vineyard*, 958 S.W.2d at 734; *State v. Pulley*, 863 S.W.2d 29, 30 (Tenn. 1993). However, a police

officer is permitted to initiate a traffic stop without a warrant for the purpose of a brief investigatory stop based upon "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [an] intrusion." *Terry*, 392 U.S. at 21; *see Binette*, 33 S.W.3d at 218. The objective standard for determining whether a police officer has specific and articulable facts that a suspect has committed a crime or is about to commit a crime focuses on whether "the facts available to the officer at the moment of the seizure . . . warrant a man of reasonable caution in the belief that the action taken was appropriate[.]" *Terry*, 392 U.S. at 21-22 (internal quotation marks and citations omitted); *see State v. Garcia*, 123 S.W.3d 335, 344 (Tenn. 2003).

"Reasonable suspicion is a particularized . . . basis for suspecting the subject of a stop of criminal activity, and it is determined by considering the totality of the circumstances surrounding the stop." *Binette*, 33 S.W.3d at 218 (internal citations omitted). This determination includes considerations relative to "'(i) the public interest served by the seizure, (ii) the nature and scope of the intrusion, and (iii) the objective facts upon which the law enforcement officer relied in light of his knowledge and experience.'" *Pulley*, 863 S.W.2d at 34 (quoting *United States v. Mendenhall*, 446 U.S. 544, 561 (1980) (Powell, J., concurring)). The objective facts upon which the officer relied may include, but are not limited to, the officer's observations, information received from fellow officers, information received from citizens, and the "pattern of operation of certain offenders." *State v. Watkins*, 827 S.W.2d 293, 294 (Tenn. 1992). "As a general rule . . . the stop of an automobile is constitutionally reasonable, under both the state and federal constitutions, if the police have probable cause or reasonable suspicion to believe that a traffic violation has occurred. *Vineyard*, 958 S.W.2d at 734 (citing *Whren*, 517 U.S. at 806).

For purposes of the present case, the parties do not dispute that a warrantless seizure occurred. Within the context of warrantless searches and seizures, the courts have recognized certain exceptions to the warrant requirement. *See, e.g.*, *State v. Meeks*, 262 S.W.3d 710, 722 (Tenn. 2008) (listing some of the commonly recognized exceptions to the warrant requirement). Such commonly recognized exceptions include a search incident to an arrest, the plain view doctrine, and consent to a search. *Id.*; *see State v. Berrios*, 235 S.W.3d 99, 104 (Tenn. 2007); *State v. Cox*, 171 S.W.3d 174, 179 (Tenn. 2005). The State has the burden to demonstrate that a warrantless search falls within an exception to the warrant requirement. *Meeks*, 262 S.W.3d at 722.

In *Pennsylvania v. Mimms*, the Supreme Court held that a lawful traffic stop permits an officer as a matter of course for officer safety to request a driver to leave the car. 434 U.S. at 111 n.6; s*ee Hanning*, 296 S.W.3d at 54 ("[O]nce a vehicle has been lawfully detained, an officer may, as a matter of course, order the driver to step out of the vehicle."). However, "*Mimms* and its progeny permit the intrusion if the officer merely

-11-

removes a defendant from his vehicle absent undue delay," which is a "fact-specific inquiry." *Donaldson*, 380 S.W.3d at 94.

The record reflects that the officer initiated the traffic stop after observing the cracked windshield, which the officer believed obstructed the driver's view of the roadway, and that the temporary license plate had expired. The video-recorded and photograph evidence reflects the cracked windshield and the expired temporary license plate. As a result, the officer had probable cause to believe that two violations had occurred. *See Vineyard*, 958 S.W.2d at 736 (A traffic stop based upon probable cause is constitutionally valid regardless of an officer's "subjective motivations."). The officer approached the car, identified himself as a KPD officer, requested that the Defendant lower the car's windows, and informed the Defendant of the grounds for the traffic stop. Upon request, the Defendant was unable to produce a driver's license or identification, registration, and proof of insurance. The Defendant told the officer that the car belonged to his "girl" and that the car was not stolen, although he did not possess any documentation. At this juncture, the officer asked the Defendant if he were on probation or parole, ostensibly to determine whether the Defendant and his car were subject to a search at any time as a condition of any potential release, and the Defendant stated that although he was not on probation or parole, he had been released recently from prison for a previous robbery conviction. The Defendant stated that he did not have a weapon and that the officer "could search it." As a result of the Defendant's responses and his lack of identification, the officer, whose testimony the trial court credited, asked the Defendant to leave the car for officer safety approximately two minutes into the body camera recording. *See Mimms*, 434 U.S. at 111 n.6. We conclude that the record supports the trial court's determination that the officer's request for the Defendant to step out of the car as a matter of course for officer safety was not unreasonable.

The officer's credited testimony reflects that as the Defendant stepped out of the car and that, as he placed handcuffs on the Defendant, he saw on the driver's seat a "clear vial with [a] gray and white powdery substance," which the officer believed to be heroin based upon his experience as a police officer. The driver's seat is not initially shown in the body camera recording because it is obstructed by the Defendant and the officer, but the vial is shown on the driver's seat at approximately two minutes and thirty-one seconds into the recording. As the officer walked the Defendant toward the police cruiser, the Defendant stated that he had "dope" inside the car, to which the officer responded that he had already seen the drugs. The officer's belief that the clear vial contained heroin provided the officer with probable cause to believe the Defendant unlawfully possessed a controlled substance. *See State v. Cothran*, 115 S.W.3d 513, 524-25 (Tenn. Crim. App. 2003) (The plain view exception to the warrant requirement applies when "the items seized were in plain view," the officer "had the right to be in the position to view the items," and "the incriminating nature of the items was immediately apparent."); *see also* T.C.A. § 39-17-417(a).

-12-

Although the officer told the Defendant that he was not under arrest and was only being detained, the officer placed handcuffs on the Defendant and performed a pat-down. The officer testified that he saw the vial containing the suspected heroin as the Defendant stepped out of the car and that he placed the Defendant under arrest based upon the substance inside the vial. The record supports the trial court's determination that the Defendant was in police custody and under arrest for possession of a controlled substance when he was placed in handcuffs, which was approximately two minutes into the body camera recording, and during the pat-down. After the pat-down, the officer told dispatch that the Defendant was in police custody and walked the Defendant to the police cruiser where the officer emptied the contents of the Defendant's pockets, and he was later placed inside the police cruiser.

The record reflects that the Defendant was placed in police custody and under arrest for possession of a controlled substance as a result of the vial in plain view on the driver's seat when the Defendant stepped out of the car and was placed in handcuffs. *See State v. Crutcher*, 989 S.W.2d 295, 300-301 (Tenn. 1999) (A custodial arrest "is justified upon a showing of probable cause to believe that a crime has been committed[] and that the suspect of the investigation committed that crime."). Although a pat-down is permissible pursuant to *Terry* to determine if a person possesses any weapons, the pat-down in this case occurred after the Defendant was placed in handcuffs and under arrest. *See Berrios*, 235 S.W.3d at 107 ("A process involving a frisk and placement into the back of a locked patrol car is more akin to a full-scale arrest than the brief detention generally incident to an ordinary traffic stop."). *But see Terry*, 392 U.S. at 24 (permitting a limited search for weapons once an officer reasonably determines that the person being investigated "is armed and presently dangerous to the officer or to others."); *Mimms*, 434 U.S. at 111-12 (reaffirming that *Terry* permits an officer to conduct a limited search for weapons when the officer has reasonably determined "that the person whom he had legitimately stopped might be armed and presently dangerous."). After the pat-down, which revealed the presence of additional controlled substances, the Defendant was escorted toward the police cruiser and later placed inside the cruiser.

When a police officer "make[s] a lawful custodial arrest," which we have concluded is what occurred in this case, the officer is "permitted, as incident to the arrest, to search the person arrested and the immediately surrounding area." *Crutcher*, 989 S.W.2d at 300; *see Chimel v. California*, 395 U.S. 752 (1969). "The rationale for those searches is the need to disarm the arrestee in order to safely take him into custody, and the need to preserve evidence for later use at trial." *Crutcher*, 989 S.W.2d at 300; *see United States v. Robinson*, 414 U.S. 218, 234 (1973). When the person being arrested is an occupant of a motor vehicle, a police officer "may conduct searches, contemporaneous to the arrest, of the passenger compartments inside the vehicle." *Crutcher*, 989 S.W.2d at 300; *see New York v. Belton*, 453 U.S. 454, 457 (1981).

-13-

Upon placing the Defendant under arrest, the officer was permitted to search the Defendant and to search the passenger compartment of the car. A search conducted pursuant to the lawful arrest, rather than a pat-down for weapons pursuant to *Terry*, resulted in the discovery of additional controlled substances in the Defendant's pants and underwear. A search of the car pursuant to a lawful arrest resulted in the seizure of the clear vial containing a controlled substance. Thus, the record supports the trial court's determination that the searches of the Defendant and of his car were incident to a lawful custodial arrest based upon probable cause to believe that the Defendant possessed suspected heroin in the vial, which was in plain view on the driver's seat.

In reaching the conclusion that the search of the Defendant and his car were incident to a lawful custodial arrest for probable cause to believe the Defendant possessed an unlawful controlled substance, we have not overlooked the State's argument, which is raised for the first time on appeal, that the searches were conducted pursuant to a lawful arrest for driving without a driver's license. *See Jackson*, 313 S.W.3d at 273 (permitting an officer to arrest, rather than to cite and release, a person for driving without a driver's license when the officer believes there is a reasonable likelihood that the offense would continue or resume, when the driver cannot provide adequate information to establish identity, or when the officer believes the driver will not appear in court). First, the record does not reflect any evidence or argument by the prosecution at the suppression hearing that the Defendant's arrest was based upon his driving without a driver's license. In fact, the officer testified that the Defendant was placed under arrest based upon the vial containing a suspected controlled substance. Further, the trial court explicitly determined that the arrest was based upon probable cause to believe that the Defendant possessed a controlled substance in connection with the vial in plain view inside the car. The trial court made no determination in connection with the Defendant's driving without a license, and the Defendant was not charged with this offense. The court merely noted that upon the Defendant's response that he did not possess a driver's license, the officer had probable cause to believe that "a different violation had occurred," which "created an entirely new line of investigation" because the officer could not determine the Defendant's identity. To be clear, the court denied the motion to suppress because the searches occurred subsequent to a lawful custodial arrest for possession of a controlled substance, and the prosecution advanced no argument related to an arrest for driving without a driver's license. Generally, arguments raised for the first time on appeal are waived, and we decline to consider the argument in the absence of the trial court's consideration on the merits of the argument. *See State v. McCormick*, 494 S.W.3d 673, 679 n.6 (Tenn. 2016) (stating that "arguments raised for the first time on appeal may be deemed waived" and declining to consider a State's argument because it was not raised in the courts below); *Hodge v. Craig*, 382 S.W.3d 325, 334-35 (Tenn. 2012).

-14-

Finally, although we have concluded that the searches were reasonable pursuant to a lawful custodial arrest, we will address the Defendant's consent to search the car, as the trial court determined that the Defendant consented to a search of the car. The record reflects that after the officer instructed the Defendant to turn off the car's engine but before the officer told the Defendant to step out of the car, the Defendant stated that he did not have a weapon and that the officer "could search it." Another exception to the warrant requirement exists for a search conducted pursuant to valid consent. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973); *State v. Bartram*, 925 S.W.2d 227, 230 (Tenn. 1996). "The sufficiency of consent depends largely upon the facts and circumstances in a particular case," and whether consent "was voluntarily given" is a question of fact." *State v. Jackson*, 889 S.W.2d 219, 221 (Tenn. Crim. App. 1993); *State v. Ashworth*, 3 S.W.3d 25, 29 (Tenn. Crim. App. 1999) (internal quotations and citations omitted).

The record reflects that unprompted, the Defendant invited the officer to search the car. The record supports the trial court's determination that even if the searches were not incident to a lawful arrest for possession of controlled substances, the Defendant consented to a search of the car. The Defendant consented before the officer asked the Defendant to step out of the car, and a search pursuant to valid consent would have ultimately resulted in the discovery of the clear vial containing the suspected heroin. As a result, the Defendant would have been subject to a search incident to a lawful arrest for the vial containing the suspected heroin and the ultimate seizure of additional controlled substances inside his underwear.

The record supports the trial court's determination that the proof established by a preponderance of the evidence that the searches of the Defendant and his car were conducted pursuant to a lawful arrest and to consent. The trial court did not err by denying the motion to suppress. The Defendant is not entitled to relief on this basis.

## II.     Motion for a Mistrial During Jury Selection

The Defendant contends that the trial court abused its discretion by denying his request for a mistrial. He argues that prospective juror fifteen's wearing sheriff's department clothes and stating he knew the Defendant professionally poisoned the remaining prospective jurors with information that the Defendant was known to law enforcement due to "prior actions." The State responds that the court did not abuse its discretion by denying the motion because a manifest necessity did not exist. We agree with the State.

A trial judge should declare a mistrial if manifest necessity arises. *Arnold v. State*, 563 S.W.2d 792, 794 (Tenn. Crim. App. 1977). Manifest necessity occurs when "no feasible alternative to halting the proceedings" exists. *State v. Knight*, 616 S.W.2d 593,

596 (Tenn. 1981). "The granting or denial of a mistrial is within the sound discretion of the trial court." *State v. McKinney*, 929 S.W.2d 404, 405 (Tenn. Crim. App. 1996); *see State v. Jones*, 802 S.W.2d 221, 222 (Tenn. Crim. App. 1990). This court will only disturb that decision if the trial court abused its discretion. *State v. Adkins*, 786 S.W.2d 642, 644 (Tenn. 1990).

The record reflects that the trial court randomly selected twenty prospective jurors from the venire. When prospective juror fifteen was selected, the trial court noted that he was wearing a "law enforcement shirt." During the court's preliminary questioning of the prospective jurors, the court asked if anyone knew the Defendant. Prospective juror fifteen stated, "I've had past dealings with him," and "I mean, not personally." The court responded, "We'll get into that a little bit later." After the court finished its preliminary questions and instructions, the trial judge stated, "I know we got a law enforcement officer. Always have to explore that a little bit further." The court held a bench conference out of the remaining prospective jurors' hearing to question prospective juror fifteen. The following exchange occurred:

> [Trial Counsel]: Your Honor, I actually have a motion as well related to his response earlier.
>
> [Juror]: I'm a retired police officer. I'm a state fire marshal also.
>
> [The Court]: Okay. But did you know him professionally--
>
> [Juror]: Professionally several times--
>
> [The Court]: Okay. Okay, . . . we agree he's got to be excused?
>
> (Counsel indicated in the affirmative.)
>
> [The Court]: Since you're in law enforcement, I have to excuse you.
>
> [Juror]: Absolutely.

The prospective juror was excused, and the bench conference continued. Trial counsel stated that the prospective juror fifteen's statement earlier that he knew the Defendant professionally, along with his wearing sheriff department clothes, might have "tainted" the remaining jurors. Counsel requested a mistrial and noted that counsel saw "numerous jurors look over at him. He obviously was law enforcement in that regard so I am--[.]" The trial judge interjected and stated that prospective juror fifteen "kind of said it fast, and that's why I jumped in there really quick to stop him." The court found that a manifest necessity did not exist to warrant sending the "jurors out and bring them back

tomorrow. Pretty much we got every juror in this panel anyway." The court offered to provide an instruction to the remaining prospective jurors to disregard any statement by prospective juror fifteen. Counsel stated that he was not requesting an instruction and noted the "dilemma" for the defense. The court stated that "it was such passing that it's okay, and since I have excused him and he's wearing a doggone law enforcement shirt, I think the jurors are just gonna see --yeah, he's law enforcement. So he can't be on the jury."

After the conclusion of the trial proof but before closing arguments, the trial court revisited the dismissal of prospective juror fifteen and the motion for a mistrial. The court provided the defense with an opportunity to clarify for the record what transpired. Trial counsel stated that the prospective juror fifteen was asked in the presence of the other prospective jurors about prospective juror fifteen's being in law enforcement and that he raised his hand when asked if anyone knew the Defendant. Counsel said that prospective juror fifteen stated he knew the Defendant professionally. The trial judge interjected that his "automatic question" was if prospective juror fifteen knew the Defendant professionally and that he nodded his head, "Yes." The judge conceded that he "shouldn't have said that" but explained that prospective juror fifteen was excused for cause. The court found that the incident did not poison the remaining prospective jurors because the jurors did not know prospective juror fifteen's "role." The court found that the jurors would have presumed prospective juror fifteen was a law enforcement officer because his shirt bore a badge, that the jurors did not know the Defendant's profession, and that the jurors would not have assumed that the Defendant was "a criminal that every police officer knows." The court stated that it wished it had not asked prospective juror fifteen if he knew the Defendant professionally but found that the remaining prospective jurors were not tainted.

We conclude that the trial court did not abuse its discretion by denying the motion for a mistrial. The record reflects that prospective juror fifteen wore sheriff's department clothes indicating he was a law enforcement officer and that, upon general questioning by the trial court, prospective juror fifteen said he had previous dealings, which were not personal, with the Defendant. The court quickly resumed its preliminary instructions and questioning of the prospective jurors. Afterward, the court held a bench conference to inquire further about the prospective juror fifteen's being a law enforcement officer. The juror was excused for cause. The juror's affiliation with law enforcement was apparent by his clothes, but the remaining prospective jurors only heard limited information that prospective juror fifteen and the Defendant had "past dealings." The remaining prospective jurors did not hear information related to the nature of those past dealings, and the record does not reflect that the jurors would have inferred that the Defendant was generally well-known to law enforcement because of previous criminal conduct. The court did not abuse its discretion by denying the motion for a mistrial after determining

that a manifest necessity did not exist. The Defendant is not entitled to relief on this basis.

### III. Asset Forfeiture Order

The Defendant contends that the trial court violated his "constitutional right to remain silent" by admitting into evidence an asset forfeiture order related to the money seized at the time of his arrest. He argues that his silence in the forfeiture proceeding was improperly used as substantive evidence of his guilt in the present case and that, as a result, his constitutional right to remain silent was violated. The State initially responds that the Defendant has waived appellate consideration of whether his right to remain silent was violated because he did not object contemporaneously on this basis, although the Defendant raised the issue in his motion for a new trial. The State concedes that the Defendant objected contemporaneously on the basis that admission of the forfeiture order was tantamount to burden shifting and that the State failed to establish that the Defendant received notice of the forfeiture proceeding. The State asserts that the Defendant is not entitled to plain error review on the constitutional claim by failing to request plain error review in his appellate brief. Alternatively, the State asserts that the defense opened the door to admission of the forfeiture order during Officer Marasigan's cross-examination and that any error by the court in the admission of the forfeiture order was harmless.

On direct examination, Officer Marasigan testified, in relevant part, that his partner found two "digital weighing scales" on the passenger side of the car. He stated that he determined the drugs possessed by the Defendant were for resale, rather than personal use, based upon the "prepackaging of it with the folded piece of paper, the weighing scales, and the amount of currency." He noted that the money was not neatly folded inside the Defendant's pants pocket and said that during drug sales, "you just put it in your pocket without having the entire money folded out to put it nicely and neatly." Officer Marasigan stated that the money was in five-, ten-, and twenty-dollar denominations, which was indicative of drug sales based upon his experience as a police officer. He said that the drugs were "separately packaged" and concealed and that "simple possession users" usually placed drugs in a pants pocket or a backpack, without attempting to conceal the drugs. He said that it was uncommon for drug users to possess large quantities of two different drugs. He said that possession of 0.1 to 0.75 gram of fentanyl and possession of 0.25 to 1.0 gram of methamphetamine were indicative of personal use. He later testified that 2.14 grams of fentanyl and 3.10 grams of methamphetamine were "a lot for a user to have."

During Officer Marasigan's cross-examination, trial counsel asked questions related to whether Officer Marasigan asked the Defendant about the source of the money the Defendant possessed at the time of the arrest. Officer Marasigan stated that he asked the Defendant where he obtained the cash, but the trial court sustained the prosecutor's

-18-

hearsay objection. Officer Marasigan stated that he seized $884 from the Defendant and that he initiated an asset forfeiture proceeding in connection with the money. Officer Marasigan said that he completed the initial forfeiture paperwork at the scene because he had probable cause to believe the money was proceeds from drug sales, which provided a basis for asset forfeiture. He later stated that he could not recall whether he or his "partner" completed the paperwork at the scene. He agreed, though, that he signed the paperwork. He agreed that he could not have sought asset forfeiture of the money if the drugs possessed by the Defendant were for personal use. Officer Marasigan said that he did not include the Defendant's car in the asset forfeiture proceeding because he did not find "packages embedded in that [car]." He said that he did not observe the Defendant selling drugs, that he did not find a "drug ledger" of sales, that he did not find a box of resealable plastic bags, and that he did not possess any evidence from the Defendant's cell phone connected to drug sales. Officer Marasigan said that despite the lack of this evidence, he determined the Defendant possessed the drugs for resale. He agreed that he stated at the scene that the Defendant did not possess "a lot of heroin." Officer Marasigan agreed that a drug user also concealed drugs. He said that although the Defendant would have been transporting the drugs in the car, he did not include the car for asset forfeiture. When asked if he thought he could not include the car in the asset forfeiture, Officer Marasigan said the Defendant reported that the car did not belong to the Defendant. Officer Marasigan noted that the Defendant's wife arrived at the scene to pick up the car and said that he did not question her about the Defendant's employment status or his drug use.

Officer Marasigan identified the notice of property seizure and forfeiture of conveyance and testified that the form was completed at the scene. The notice of asset forfeiture was not received as an exhibit. He agreed that the notice showed that the drugs, along with the containers, weighed an aggregate of 27.47 grams. He did not recall whether any drug residue was on the scales found inside the car and said that he did not field test the scales or send the scales for a laboratory analysis. He agreed that one set of scales was new and did not contain batteries. He did not recall if the second set of scales was operational.

During redirect examination, a bench conference was held out of the jury's hearing. The prosecutor requested permission to present evidence in the form of a certified copy of a March 17, 2022 asset forfeiture order in connection with the $884 seized at the time of the Defendant's arrest. The prosecutor stated that at the time the money was seized, the Defendant was advised "how to get the money back, and he did not follow those steps." Trial counsel immediately responded, "Burden shifting." The prosecutor disagreed and argued that the forfeiture order was relevant because "the implication on cross was that this officer . . . could have asked where he works, . . . giving the defendant an opportunity to explain that the money came from legitimate means. . . . [T]he [S]tate wants to show . . . that the defendant did not produce that the

money came from legitimate means" during the forfeiture proceeding. The defense argued that the forfeiture order for the money was tantamount to burden shifting in the criminal proceeding and that the defense did not have to prove the Defendant acquired the money from a legitimate source. Trial counsel noted that the Defendant was in confinement at the time of the asset forfeiture proceeding and that the "certified copy" showed that "they're sending this to his house," not the jail. Counsel argued that no evidence showed the Defendant received adequate notice of the asset forfeiture documents and proceeding.

The trial court disagreed that introduction of the forfeiture order was burden shifting but initially prohibited the prosecution from presenting the evidence about seizing the money and the related asset forfeiture proceeding at this juncture. After a lengthy discussion, the court stated that trial counsel asked questions "to make it sound like that they charged him with [a] felony because they could seize the money." Counsel said that "they [are] not contesting the money being forfeited that is somehow indicative of possession with an intent (inaudible) think he did demonstrate that he received that (inaudible) notice of forfeiture proceedings to begin with. So think we need a jury-out to lay the foundation."

The trial court determined that the forfeiture order was "going to muddy the waters" but that what trial counsel argued during closing could "trigger" the court to reopen the proof to permit the prosecutor to present the forfeiture order into evidence. The trial judge stated, "I probably would stay away from anything about the [S]tate not doing certain acts with the money," and declined to allow the prosecutor to present the order. Trial counsel clarified for the court that evidence was already presented that the money had been seized and subject to asset forfeiture and that the point counsel attempted to make on cross-examination was that the car could have been seized, as well, but that the officer did not seize it. Counsel argued that law enforcement's seizure of money was relevant to bias and motive for the police to conclude that a felony had been committed, rather than a misdemeanor, in order for the police to be permitted to seize money. The court stated that it was not "too worried" about whether the car was seized. The following exchange occurred:

> [The Court]: Does he even know that there's a procedure for --
>
> [The Prosecutor]: He does because I talked to him about it –
>
> [The Court]: Then I think . . . based upon that, . . . they can get in to say if money's seized, is there a procedure for the defendant to get that back, and then he probably doesn't have much more knowledge other than that.

-20-

[The Prosecutor]:    He . . . does, because I showed him the order last night.

[The Court]:         Oh.

[Trial Counsel]:     Well, he doesn't have really personal knowledge then.

[The Prosecutor]:    I've got a certified copy.

[The Court]:         Got a certified order.  So that's why you want to get [the] order in.  Yeah, I mean, I get your argument.  If you make that argument, I think they get to counter with a--I'm gonna overrule your objection.

[Trial Counsel]:     So I guess this is -- this will only become an issue if I decide to argue that?

[The Court]:         Well, I think you kind -- went down that road when you opened it on cross to ask about . . . .  Like you can't -- like if it's simple possession, he can't seize it.

[Trial Counsel]:     Okay.

                     . . . .

[Trial Counsel]:     . . . [B]ut I guess I would be able to cross him then on the fact that -- the letter says "undelivered."

                     . . . .

[The Court]:         Yeah.  Yeah.  You can ask him that and -- but I'm going to let them bring it in . . . to counter-act the question about the--

[trial counsel]:     Simple possession.

The prosecutor and trial counsel agreed that "the envelope" would be admitted into evidence, and the trial court stated, "Okay."

When redirect examination resumed, Officer Marasigan explained generally the asset forfeiture process in connection with money.  He said that he completed "that form," which stated why the officer deemed the money to be proceeds from narcotic sales, and that he presented the form to a magistrate, who made a probable cause

determination to seize the money. Officer Marasigan said that at a later date, a person could "claim . . . to get it back." He said that a person was given the opportunity to show the money came from a legitimate source and that, if successful, the money would be returned. The prosecutor asked if the Defendant was provided with the opportunity to "do that," and the defense objected on the basis the officer lacked personal knowledge. The record reflects that Officer Marasigan nodded his head from side to side in the negative when the court stated that Officer Marasigan probably did not participate in any of the forfeiture proceeding.

A bench conference was held out of the jury's hearing. The trial court prohibited the prosecutor from asking Officer Marasigan "what it means if he doesn't have a hearing." The court stated, "I would just introduce the order." After the bench conference, the trial court received the forfeiture order as an exhibit. The order stated, in relevant part, that a judicial forfeiture warrant was obtained, that a notice of seizure and issuance of the warrant was given or reasonably attempted to be given, and that a petition had not been filed by anyone asserting a claim to the money within thirty days of the issuance of the notice of seizure. The order stated that, as a result, the property was forfeited to the seizing agency, which was KPD. However, the record reflects that the exhibit did not include an envelope that the parties and the court agreed would be included as part of the exhibit. Neither the prosecutor, nor trial counsel, questioned Officer Marasigan about the forfeiture order.

After the proof but before closing arguments, the defense renewed its objection to admission of the forfeiture order "with envelope." Trial counsel argued that admission of the order improperly shifted the burden to the Defendant and violated his right to remain silent. Counsel argued that the prosecution had the burden of proving the Defendant's guilt beyond a reasonable doubt and that the Defendant had no obligation to prove anything, including that the money came from a legitimate source. Counsel anticipated the State's asserting during closing argument that the Defendant's "failure to respond to this was proof of his guilt in this case or that the funds were from some illicit source because he didn't prove their validity." Counsel argued that these arguments ran afoul of the Defendant's not having an "obligation to prove anything."

Trial counsel also revisited the envelope. Counsel referred to an envelope provided in the discovery materials that showed the forfeiture documents mailed to the Defendant had been "returned to sender." Counsel stated that he and co-counsel "were under the impression that we had reached an agreement that [the envelope] was going to be coming in. I mean, obviously, the exhibit is listed with envelope." Counsel requested that the envelope be admitted into evidence based upon the discussions during the bench conference and upon principles of basic fairness. Counsel said he anticipated the State would assert during closing argument that the order showed the prosecution "following up or . . . taking additional steps" or that the order showed "proof of the funds being

illicit." Counsel did not know if the prosecutor would stipulate to the envelope's admissibility into evidence but noted that the prosecutor had agreed and had not objected during the bench conference.

The prosecutor stated that during the bench conference, the issue about the envelope arose when she

> showed the order that was attached to the letter that [she] had received from the Department of Safety, and the defense wanted [her] to introduce the envelope and the order as well and did not want me to introduce the other items that [were] in . . . the letter, and so that's what [she] did.

The prosecutor clarified that she sought admission of the order "because of the line of questioning that was posed to Officer Marasigan about what followup investigation he did conduct." The prosecutor, likewise, clarified that the certified letter that was "attempted to be delivered" to the Defendant was a "different issue because they tried to deliver that letter to him on three different occasions. That's the address that [the Defendant] had provided. I just think it's . . . a different issue that I think requires additional proof." Trial counsel told the trial court that "each time this letter is delivered, he's sitting in jail in Knox County."

We glean from this discussion that, at the time of the bench conference, trial counsel believed that the envelope was the same envelope provided in discovery showing that the forfeiture documents had been returned to sender and not delivered to the Defendant. We, likewise, glean that, at the bench conference, the prosecutor was referring to the envelope in connection with the documents sent to her from the Department of Safety.

The trial court declined to reopen the proof and found that the envelope addressed to the prosecutor was not relevant. The court stated that the envelope was addressed to the prosecutor and that "it's where they sent to her a certified copy, I'm assuming, because it's dated the same date it was certified on. So I don't think the envelope needs to go back, and I'm going to return it" to the prosecutor. The court did not address the envelope contained in the discovery materials showing that the forfeiture documents were returned to sender.

The trial court, likewise, declined to reverse its previous ruling to admit into evidence the certified copy of the forfeiture order. The court noted the defense's questions on cross-examination related to the officer's seizing the money but not the car, "implying that you don't see this as contraband to drug sales." The court said that seizure of the money "cuts both ways." The court determined that the defense could argue that the police merely wanted the Defendant's money and that the officer deemed the money

proceeds from drug sales in order to seize it.  The court determined, as well, that the State could argue the officer honestly believed the money was from drug sales and seized it, which was later forfeited.  The court disagreed that the admission of the forfeiture order shifted the burden to the defense and found that the order only reflected that the money was seized as "contraband from drug sales."  The court dismissed the notion that the jurors would infer from the order that the Defendant conceded the money was from drug sales because he did not respond to the forfeiture notice.  The court stated that the prosecution's argument was that the defense's assertion that "the police didn't do anything to follow up or treat this as a felony" was untrue because the police seized the money and obtained the Defendant's cell phone pursuant to a search warrant.[4]

The record reflects that the trial court did not provide a jury instruction in connection with the forfeiture order and that neither party requested an instruction. During closing argument, the prosecutor stated, in relevant part, as follows:

> The defense would have you believe that [the Defendant] cannot be guilty of selling drugs because . . . KPD did not do any followup investigation. Ladies and gentlemen, you have the forfeiture order.  He followed up on the money.  You heard testimony yesterday that they did seize the cell phone, that they did apply for a search warrant for the cell phone, get into it. [KPD] did do follow-up investigation here.

The defense argued in connection with additional police investigation into the source of the money as follows:

> Well, [the police] . . . filed for a forfeiture.  What evidence do we have that really interprets what we have from an evidence standpoint?  We don't even know if he got the paperwork.  We don't know what circumstances may be behind that.  They say, "Okay.  But we applied for the search warrant.  Couldn't get into the cell phone."  That's why you don't have anything off the cell phone.
>
> . . . .
>
> . . . [W]e don't know if [the Defendant] is in a situation, right, where . . . maybe he's got a job.  We don't know.  We didn't hear any evidence about his income.  Didn't hear any evidence what access to funds he might actually have.  They didn't ask.  They didn't investigate that.  They didn't

---

[4] The trial evidence showed that the police unsuccessfully attempted to view the contents of the Defendant's cell phone after obtaining a search warrant.

care. They could have cared less. So maybe somebody--maybe a family member entrusted him with some money. Maybe he had a little bit of money from working. Maybe he sold something. Maybe he just carries cash on him because that's what people do sometimes.

But maybe he was irresponsible with that money and decided to go [buy] some drugs with it. Maybe he's someone who uses drugs to the extent that that's what he went and asked for. And so why did the person who sold those drugs then package it that way? Because that's how that person packaged it.

The forfeiture order was not mentioned during the State's rebuttal argument.

As a preliminary matter, we consider the State's argument that the Defendant has waived appellate consideration of whether admission of the forfeiture order violated his right to remain silent by failing to make a contemporaneous objection on this basis at the bench conference. The record reflects that at the initial bench conference, the defense objected to admission of the forfeiture order on the grounds that the order was tantamount to burden shifting because the State had the burden of proof and because the Defendant did not have to prove the money came from a legitimate source. The Defendant, likewise, argued that the evidence did not show that the Defendant received notice of the forfeiture proceeding because he had been in pretrial confinement. However, before closing arguments, the defense renewed its objection to the order on the ground that it improperly shifted the burden to the Defendant, which in turn, violated his right to remain silent. We conclude that the Defendant promptly brought the issue to the court's attention and that the court had the opportunity to consider the merits of the objection. The issue was raised in the motion for a new trial, as well. *See* T.R.A.P. 3(e) (requiring that issues regarding the admission of evidence be raised in a motion for new trial in order to avoid waiver).

At the motion for a new trial hearing, the defense argued that admission of the order "commented on his right to remain silent," which shifted the burden of proof to the defense, creating a presumption that the money was unlawfully obtained because the Defendant did not "file that civil forfeiture challenge and pursue recovering that money." The defense, likewise, argued that the prosecution failed to show that the Defendant received notice of the forfeiture proceeding. The defense asserted that the order was improperly admitted and impacted the jury's verdict because the chosen defense was that the possession was for personal use, which made the "money that was found on him . . . central to the jury's deliberations." The prosecutor declined to present any arguments, and the trial court stated that it would not "deviate" from its ruling during the trial. Accordingly, appellate consideration of the issue is not waived.

As a condition precedent to admissibility, evidence must be relevant. Evidence is relevant and generally admissible when it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401, 402. Questions regarding the admissibility and relevance of evidence generally lie within the discretion of the trial court, and the appellate courts will not "interfere with the exercise of that discretion unless a clear abuse appears on the face of the record." *State v. Franklin*, 308 S.W.3d 799, 809 (Tenn. 2010) (citing *State v. Lewis*, 235 S.W.3d 136, 141 (Tenn. 2007)).

A trial court abuses its discretion when it applies an incorrect legal standard or reaches a conclusion that is "illogical or unreasonable and causes an injustice to the party complaining." *State v. Ruiz*, 204 S.W.3d 772, 778 (Tenn. 2006). Relevant evidence, however, "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403.

The record reflects that the crux of the defense was the Defendant possessed fentanyl and methamphetamine for personal use, which, in turn, leads to an inference or conclusion that the money possessed by the Defendant was not from the unlawful activity of selling drugs. To be clear, the prosecution, not the Defendant, had the burden of proof at the trial to show that the Defendant possessed with the intent to sell controlled substances, and the Defendant is entitled to remain silent and has no obligation to testify in his defense. *See* T.C.A. § 39-11-201 (2018); *see also* U.S. Const. amend. V, XIV; Tenn. Const. art. I, § 9; T.C.A. § 39-11-201(c); *State v. Jackson*, 444 S.W.3d 554, 585 (Tenn. 2014).

The officer testified that he believed the drugs were possessed for resale, rather than personal use, based upon, in relevant part, the amount of money the Defendant possessed and the manner in which it was folded. The officer, likewise, testified that he believed the money was the product of drug sales and did not come from a legitimate source. During cross-examination, the defense questioned the officer about his subsequent investigation to determine the source of the $884 seized from the Defendant at the time of his arrest. The defense attempted to show police bias and motive to charge the Defendant with possession with the intent to sell a controlled substance, rather than possession for personal use, in order to seek forfeiture of the money to the arresting police agency. The Defendant elicited testimony that although the Defendant transported the drugs inside the car and scales were found on the passenger side of the car, the officer did not seek forfeiture of the car in addition to the money. The evidence showed, as well, that the officer did not observe the Defendant selling drugs, that he did not find a "drug ledger" of transactions, that he did not find boxes of resealable plastic bags, that no drug-related information was recovered from the Defendant's cell phone, and that no

laboratory analysis was conducted to determine whether drug residue was present on the two sets of scales. The officer, likewise, did not inquire with the Defendant's wife, who took possession of the car at the scene, about the Defendant's employment status or drug use. We note that during the officer's cross-examination, the State's hearsay objection was sustained by the trial court when the officer was asked if he questioned the Defendant about the source of the money.

Upon the defense's line of questioning to show that an investigation into the source of the money was not conducted, the State sought to admit the forfeiture order, which showed that the Defendant did not seek to have the money returned to him and that the money was forfeited to the police. The prosecutor's initial stated purpose for admitting the order was to respond to the defense's questions that implied the officer could have asked where the Defendant worked and given the Defendant the opportunity to explain that the money came from a legitimate source. The prosecutor, at least initially, wanted to show that the Defendant did not "produce that the money came from legitimate means" at the forfeiture proceeding.

The intent of the defense's line of question was not that the officer did not provide the Defendant with the opportunity to explain the source of the money, although the prosecutor initially argued the basis for admitting the forfeiture order was to establish the Defendant did not show the money came from a legitimate source at the forfeiture proceeding. We note that the Defendant was entitled to invoke his right to remain silent and was not obligated to incriminate himself to the officer or in any criminal or administrative proceeding. *See* U.S. Const. amend. IV; Tenn. Const. art. 1, § 9. Silence after a person has received *Miranda* warnings is not an admission of guilt. *See Wainwright v. Greenfield*, 474 U.S. 284, 295 (1986) ("[S]ilence will carry no penalty" after a person has been provided *Miranda* warnings.); *Doyle v. Ohio*, 426 U.S. 610, 618-19 (1976) (The use of a defendant's silence after receiving *Miranda* warnings "rests on the fundamental unfairness of implicitly assuring a suspect that his silence will not be used against him and then using his silence to impeach an explanation subsequently offered at trial."); *Carter v. Kentucky*, 450 U.S. 288 (1981). The record reflects, though, that the trial court did not admit into evidence the forfeiture order as substantive evidence of the Defendant's guilt or to show that the Defendant was given but declined the opportunity to explain the source of the money. Rather, the trial court admitted the order for the purpose of showing that the police investigated the source of the money.

The record reflects that the intent of the defense's line of questioning was that the officer failed to investigate meaningfully the source of the money and presumed the money was from an illegitimate source in order to seize it and to have it forfeited to the police. This presumption, in turn, resulted in the criminal charge that the possession was with the intent to sell, rather than for personal use. Evidence that the Defendant did not

produce evidence at the forfeiture proceeding to show the source of money was not the intent of the defense's questions. The nuanced distinction is critical.

In addressing the officer's follow-up investigation on redirect examination, the prosecutor did not question the officer about his efforts to investigate whether the money came from a legitimate source. The prosecutor's focus was on the procedure of the forfeiture proceeding and how a person could seek to have property returned to the person after a forfeiture proceeding was initiated. When specifically asked whether the Defendant was afforded an opportunity to seek to have the money returned to him in this case, the record reflects that the officer nodded his head side to side in the negative, indicating that the officer had not participated and had been present at the forfeiture proceeding. The record does not reflect that the officer was involved with the forfeiture proceeding beyond completing the initial paperwork for a magistrate to make a probable cause determination at the time of the seizure. Without requiring the State to present evidence that the forfeiture proceeding constituted any subsequent police investigation of the source of the money, the trial court permitted the prosecutor to introduce the order showing that the Defendant had not sought to have the money returned and that it was forfeited. *See State v. Taylor*, 240 S.W.3d 789, 797-802 (Tenn. 2007) (discussing the necessity to establish sufficient foundation of familiarity with the evidence before admitting evidence pursuant to a hearsay exception); *see also* Tenn. R. Evid. 803(8) (public records hearsay exception). The forfeiture order was irrelevant to the State's intended purpose of showing the officer's investigation into the source of the money.

The forfeiture order was, likewise, irrelevant to whether the Defendant possessed the drugs with the intent to sell or for personal use, which was the critical issue in this trial. The Defendant admitted that he possessed the drugs, and the sole issue for the jury's determination was the reason for his possession, resale or personal use. Because the record does not reflect that the Defendant received the forfeiture documents, this court has grave reservations about whether the Defendant received adequate notice under due process principles about the time, manner, and place the Defendant could have objected to the forfeiture proceeding. *See* T.C.A. §§ 40-33-204 (governing the issuance of forfeiture warrants); 40-33-205(a) (regarding notice of forfeiture hearing); *see also Ally Financial v. Tenn. Dep't. of Safety and Homeland Sec.*, 530 S.W.3d 659 (Tenn. Ct. App. 2017) (discussing notice requirement by the Department of Safety regarding the issuance of forfeiture warrants and hearings); Tenn. Comp. R. & Regs. 1340-02-02-.06(2)(b), (c) (information that must be contained in the notice that a forfeiture warrant issued); *Redd v. Tenn. Dep't of Safety*, 895 S.W.2d 332, 334-35 (Tenn. 1995) (discussing notice requirements to satisfy due process rights in a forfeiture proceeding). Although arguments by counsel are not evidence, the record reflects that the Defendant was confined to the jail at the time of the attempted delivery of the forfeiture documents and that three attempts at delivery were unsuccessful. Thus, in addition to the order being irrelevant, it is speculative, at best, that the Defendant received adequate notice, and we

note that during the bench conference, trial counsel requested a jury-out hearing to "lay the foundation" for the forfeiture order, which the court declined to do. *See* Tenn. R. Evid. 901(a).

The amount of money possessed, the denominations, and the nature of how it was folded inside the Defendant's pants pocket, in conjunction with other evidence seized during the searches, was the relevant evidence. The fact that the money was later forfeited to the police department because the Defendant did not seek to have it returned is irrelevant to whether the Defendant possessed the drugs with the intent to sell or for personal use and to whether the police conducted any follow-up investigation into the source of the money after it was seized. As a result, we conclude that the trial court abused its discretion by admitting into evidence the forfeiture order. Because we have concluded that the forfeiture order was irrelevant and, therefore, inadmissible pursuant to the rules of evidence, we must determine whether the Defendant is entitled to relief due to the admission of the forfeiture order.

Recognizing that all errors are not equal, our supreme court has established three categories of error—structural constitutional error, non-structural constitutional error, and non-constitutional error. *State v. Powers*, 101 S.W.3d 383, 397 (Tenn. 2003); *State v. Garrison*, 40 S.W.3d 426, 433-34 (Tenn. 2000); *State v. Harris*, 989 S.W.2d 307, 314-15 (Tenn. 1999). The distinctions between these categories dictate the standards to be applied when determining whether a particular error is harmless. *State v. Rodriguez*, 254 S.W.3d 361, 371 (Tenn. 2008). A trial court's error in admitting evidence under the Tennessee Rules of Evidence falls into the category of non-constitutional error, and harmless error analysis under Tennessee Rule of Appellate Procedure 36(b) is appropriate. *See State v. Clark*, 452 S.W.3d 268, 287 (Tenn. 2014); *see also State v. James*, 81 S.W.3d 751, 763 (Tenn. 2002) (noting that "[h]armless error analysis applies to virtually all evidentiary errors other than judicial bias and denial of counsel"). Pursuant to Rule 36(b), the defendant bears the burden of showing that a non-constitutional error "more probably than not affected the judgment or would result in prejudice to the judicial process." T.R.A.P. 36(b); *see Rodriguez*, 254 S.W.3d at 372.

Because admission of the forfeiture order was improper pursuant to the rules of evidence, a harmless error analysis applies. We conclude that admission of the forfeiture order was harmless error for two reasons. First, the State presented sufficient evidence, without the forfeiture order, to support the Defendant's convictions for possession with the intent to sell fentanyl and methamphetamine. The officer, whose evaluation of the evidence was based upon his experience and training as a police officer, testified that the drugs were prepackaged in a manner consistent with drug sales. The search of the car revealed digital scales and drugs. The search of the Defendant revealed drugs and a large quantity of money in small denominations, which the officer testified was consistent with drug sales. The officer said that the money was not neatly folded inside the Defendant's

pants pockets, which was likewise consistent with drug sales. The officer said that the manner in which the drugs were concealed was, likewise, consistent with drug sales. Further, the Defendant possessed 2.14 grams of fentanyl and 3.10 grams of methamphetamine, which the officer described as large quantities of drugs and as inconsistent with personal drug use. The officer stated that 0.1 to 0.75 gram of fentanyl and 0.25 to 1.0 gram of methamphetamine were quantities consistent with personal drug use. The jury was free to infer from the large quantity of drugs, in conjunction with other relevant evidence, that the Defendant's possession was with the intent to sell. *See* T.C.A. § 39-17-419 (inferences based on drug weight).

Second, although the forfeiture order was improperly admitted, the State asserted during closing argument that the order showed the officer's follow-up investigation into the source of the money, albeit without any evidence to support this claim, and the reference to the order was brief. The State did not argue before the jury that the order was substantive evidence of the Defendant's guilt that he possessed fentanyl and methamphetamine with the intent to sell because he did not present evidence at the forfeiture proceeding showing the money came from a legitimate source. Therefore, the Defendant has not shown that admission of the forfeiture order "more probably than not affected the judgment or would result in prejudice to the judicial process." T.R.A.P. 36(b); *see Rodriguez*, 254 S.W.3d at 372. The Defendant is not entitled to relief on this basis.

In consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

**s/ Robert H. Montgomery, Jr.**
ROBERT H. MONTGOMERY, JR., JUDGE